Filed 3/15/16  In re J.V. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re J.V. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B265746 (Super. Ct. No. JV46501) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,  Plaintiff and Respondent,  v.  JULIO V.,  Defendant and Appellant. | |

Julio V. (father) appeals the juvenile court's order terminating parental rights to his minor children J.V. and L.V. with a permanent plan of adoption (Welf. & Inst. Code,[1] § 366.26).  Father claims the court erred in excluding evidence regarding the suitability of the prospective adoptive father and in finding that the beneficial parental-child relationship exception did not apply.  (*Id.* at subd. (c)(1)(B)(i).)  We affirm.

_____

[1] All statutory references are to the Welfare and Institutions Code.

FACTS AND PROCEDURAL HISTORY

*Detention, Jurisdiction, and Disposition*

Father is the presumed father of J.V., born in March 2012, and L.V., born in March 2013. The San Luis Obispo County Department of Social Services (DSS) filed a section 300 petition as to them after L.V. tested positive for methamphetamine at birth. The petition also alleged the parents abused drugs and engaged in physical violence in the minors' presence.[2] The children were detained and the parents agreed to enroll in counseling and complete drug and alcohol assessments. On May 9, 2013, the minors were returned to mother on the condition they stay at a local homeless shelter. Three weeks later, DSS filed a section 387 supplemental petition reporting that father had brought the children in and requested that DSS take custody of them. The court ordered the minors detained under the supplemental petition and placed them in foster care. At the jurisdiction and disposition hearing, the court took jurisdiction over the minors and granted the parents six months of family reunification services. Both parents were in custody and were awarded jail visits.

*Review Hearings, Termination of Services, and Writ Review*

At the three-month review hearing, DSS reported that father had been granted probation and was participating in drug and alcohol services (DAS) and family treatment court (FTC). Mother was in jail and wanted the minors to be placed with father or the maternal uncle (the prospective adoptive father). At the six-month review hearing, the court granted an additional six months of services. At the 12-month review hearing, services were again extended for six months. Two months later, DSS reported that father had "struck out" of FTC and terminated from DAS.

In September 2014, father filed a modification petition seeking dismissal of the dependency action and the return of the minors to his custody. In its 18-month review report, DSS recommended that services be continued for an additional 90 days

---

[2] The minors' mother, Bianca H. (mother), is not a party to this appeal.

with the goal of transiting into family maintenance services. In November 2014, it was reported that father was romantically involved with a woman who abused drugs (Candice) and was not being treated for his substance abuse issues. DSS filed a section 388 petition requesting that services be terminated and the matter set for a section 366.26 hearing. At the 18-month review hearing, father admitted he had continued seeing Candice and had allowed her in his home. He also admitted he had yet to complete a parenting class and batterer's prevention program. The court denied father's section 388 petition, terminated services, and set the matter for a section 366.26 hearing. Father petitioned for writ review and we denied the petition. (*Julio V. v. S.L.O. County Superior Court* (June 23, 2015, B261956) [nonpub. opn.].)

*The Section 366.26 Proceedings*

While father's writ petition was pending, he filed another section 388 petition requesting that the minors be returned to him either under family maintenance or pursuant to a dismissal. DSS opposed the petition and recommended that parental rights be terminated with adoption as the minors' permanent plan. DSS planned to move the minors from their current foster home to the home of their prospective adoptive parents (the maternal uncle and his fiancé). The prospective adoptive parents were committed to adoption but they lived too far away for the children to be placed with them during the reunification phase. The prospective adoptive parents were also open to continued visitation with the parents if it was in the minors' best interests. DSS reported that father had continued seeing Candice and that she was present during a recent overnight visit.

On July 6, 2014, DSS reported that father had been charged with driving under the influence and other crimes. Two days later, the court denied father's section 388 petition and proceeded with the section 366.26 hearing. Father's attorney called the social worker to testify and asked if she had "reviewed the video that [counsel] sent [her] regarding the rap that [the prospective adoptive father] recorded[.]" The court overruled DSS's relevance objection. The social worker then testified that her supervisor "did confirm that it is [the prospective adoptive father] in the video, and that it's a three-or

3

four-minute video that has violent lyrics in the rap music." The social worker had spoken to the prospective adoptive father about the video and it did not cause her to question the minors' placement with him. The prospective adoptive father told her he makes his living selling cars and "promot[ing] artists in the rap and hip hop genre." The video was filmed several years ago and "in terms of the content, that's not a lifestyle he's promoting. He said it's a genre of music." The minors were reported to be "doing very well" in their placement and "seem[ed] to be bonding" with the prospective adoptive parents. If the current placement fell through, the social worker was confident that another suitable adoptive placement would be found.

In anticipation of the continued hearing on July 22, 2015, DSS moved for reconsideration of the court's order overruling its objection to evidence regarding the rap video and made a continuing objection to any further evidence on the issue. DSS also reported that the prospective adoptive father told the social worker "he was with one of the musical groups he promotes at a filming event, and they asked him to 'freestyle' (meaning to improvise), as he created some rap music 10 years ago. He remembered some lyrics from when he did rap music, and he was filmed doing this 1.5 minute 'freestyle' rap. He said he did not place it on the Internet, that 'Magic Shutter Films' must have placed it on Facebook on the Internet[.]" The prospective adoptive father said "he does not and never has owned a gun, and the name 'Pistol Pete' was a name he used for rap music over ten years ago, when he was 24 years old. He said he is now 35 and no longer creates rap music. He understands the concern regarding violent content and pointed out that this is entertainment, and that in many genres including films and novels, there may be violent content but it does not affect the creator's home life or children." The report also attached the results of father's blood tests following the accident that resulted in his arrest and added that he had pled no contest to driving under the influence of alcohol, willful failure to submit to chemical test, and battery.

At the continued hearing, the court reconsidered DSS's objection to the rap video evidence and struck the evidence. Father testified he had completed parenting and

4

domestic violence classes and had maintained visitation with the minors throughout most of the dependency proceedings. The minors both refer to him as "Papa" and look to him as their father. He stressed that he was "never going to stop fighting for them" and claimed "I admitted no contest to everything because I wanted to get out and fight for custody of my kids."

Father also offered into evidence the report of a bonding study conducted in March and April 2015. Dr. Heidler, the psychologist who conducted the study, found that that the minors were attached to father but L.V.'s attachment was more "anxious." The doctor opined that [L.V.]'s "style of attachment" was probably "due to the number of placement disruptions in the first two years of his life." Father was nurturing and enjoyed his time with the children. The doctor ultimately concluded that "[p]aramount above all else, [the minors] need to be in a permanent home with a caregiver who is committed to caring for the children and who is willing to continue to work on strengthening bonding, attachment, and relationships." The doctor "hoped that if the children were to be placed in an adoptive home, they would be able to have some contact with [father] as this will serve them well in the future when attempting to make sense of early loss and abandonment issues."

At the conclusion of the hearing, the court found by clear and convincing evidence that the minors were likely to be adopted and terminated parental rights. Father timely appealed.[3]

## DISCUSSION

*Evidence Regarding the Suitability of*
*the Prospective Adoptive Parents*

Father contends the court erred in excluding evidence regarding the prospective adoptive father's participation in a rap video. He claims the evidence was

---

[3] Although father also appealed the denial of his section 388 petition, his opening brief acknowledges that he makes no arguments challenging that ruling.

admissible and relevant to prove "the character of the uncle and the safety of a placement in his home[.]" We disagree.

"At the selection and implementation hearing under section 366.26, the trial court determines whether the child is adoptable on the basis of clear and convincing evidence. [Citations.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) "A prospective 'family's suitability to adopt is irrelevant to the issue whether the minor[] [is] likely to be adopted,' which is the *only* issue at the selection and implementation hearing. [Citation.] 'The sole issue at the selection and implementation hearing is whether there is clear and convincing evidence that the child is adoptable. [Citations.] In resolving this issue, the court focuses on *the child*-whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. [Citation.]' [Citation.]" (*Id.* at p. 733.)

Father asserts that the prospective adoptive father's suitability is relevant because the court's finding of adoptability was contingent upon his willingness to adopt. (See *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 (*Sarah M.*).) Although the social worker testified that the minors were generally adoptable, father relies on the proposition that "[a] social worker's opinion, by itself, is not sufficient to support a finding of adoptability. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.)

Father misconstrues the law and the record. "Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent [citations]." (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) However, "'[g]eneral suitability to adopt is a subjective matter which does not constitute a legal impediment to adoption. If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is not envisioned by the statutory scheme.' [Citation & fn. omitted.]" (*Ibid.*)

6

In any event, the social worker's opinion that the minors are generally adoptable was not the only evidence on the issue. There was also the adoption assessment report and the report on the bonding study, both of which indicate the children are relatively healthy and well-adjusted. Father characterizes L.V. as suffering from "attachment issues," yet nothing suggest that these issues might render it difficult to find an adoptive home for him and his sibling. (Compare, e.g., *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062 [addressing "the adoptability of a child who require intensive care for life"]; *In re Asia L.* (2003) 107 Cal.App.4th 498, 512 [record indicated that minors' "emotional and psychological development present a potential obstacle to adoption"].) Moreover, the prospective adoptive parents' willingness to adopt supports a finding the minors are "'likely to be adopted within a reasonable time either by the prospective adoptive parent *or some other family*.' [Citation.]" (*In re Josue G.*, *supra*, 106 Cal.App.4th at p. 733.) Father's claim that the relevant authority "may be out-of-step with the evolutional of the juvenile court law" is unpersuasive.[4]

Father asserts that evidence of the prospective adoptive father's suitability was also relevant because "[a]doption by the uncle would likely permit the children to have contact with the father in the future and Dr. Heidler explained that such contact with father would assist the children in attempting to make sense of early loss and abandonment." The court's finding that the minors are adoptable is not, however, contingent upon a guarantee or expectation that father will continue to have contact with the children after their adoption. Indeed, the court was precluded from basing its finding on such a contingency. (*In re C.B.* (2010) 190 Cal.App.4th 102, 128.)

We also reject father's claim that the court's refusal to consider the evidence violated his due process rights. A parent's due process right to present evidence at a section 366.26 hearing is "limited to presenting 'relevant evidence of significant probative

---

[4] Father also relies on section 361.3, which gives preferential consideration to relative requests for placement. This statute has nothing to do, however, with the determination the court was required to make at the section 366.26 hearing, i.e., whether the children were likely to be adopted.

7

value to the issue before the court.' [Citation.]" (*In re A.G.* (2008) 161 Cal.App.4th 664, 670.) As we have explained, the evidence at issue here was not relevant to the sole determination at hand—whether the children were likely to be adopted.

*The Beneficial Parental-Child Relationship*

*Exception (§ 366.26, subd. (c)(1)(B)(i))*

Father contends the court erred in finding that that the benefits of continuing the parent-child relationship do not outweigh the benefits of adoption. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We review for substantial evidence and determine whether the trial court abused its discretion. (*Ibid.*) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will chose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

To establish the parent-child relationship exception, father first had to demonstrate that he maintained regular contact with J.V. and L.V. (§ 366.26, subd. (c)(1)(B)(i).) Once that was established, he had the burden of demonstrating that the children would benefit from continuing the relationship to an extent that outweighed the benefits of adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) He had to "show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Father fails to make the requisite showing on the second prong. He undoubtedly has a bond with the children, but they have also bonded with the prospective adoptive parents. Moreover, father offers nothing to demonstrate that the benefits the children would derive from continuing their relationship with him outweigh the stability and permanency they will obtain through adoption. Although he notes that Dr. Heidler "hoped" the children would be able to maintain contact with father, the doctor did not opine that they would suffer great harm if the relationship were severed. On the contrary, the doctor emphasized that "[p]aramount above all else, [the children] need to be in a

8

permanent home with a caregiver who is committed to caring for the children and who is willing to continue to work on strengthening bonding, attachment, and relationships." DSS took the position that father was unable to satisfy this need and noted: "[Father] has demonstrated that he continues to struggle with impulsivity, his ability to manage his anger in appropriate ways, and substance abuse problems. He is not capable of raising his two young children. These children deserve and require permanency at this point in their lives. Their [prospective adoptive parents] are able and willing to provide a safe, stable, and nurturing home for them, and are committed to meeting their psychological, emotional and physical needs." Father has offered nothing to refute this assertion. Accordingly, the court did not err in declining to apply the beneficial parental-child relationship exception to adoption here.

The judgment (order terminating parental rights) is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

9

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____


Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Leslie H. Kraut, Deputy County Counsel for Plaintiff and Respondent.